# OYER AND TERMINER.

## NEW-YORK, SEPTEMBER, 1823.

The People
vs.
Jane Garretson, Susan Brown,
and Hannah Thompson.
} MURDER.

Present—Honourable *Ogden Edwards*, Circuit Judge.

*Richard Riker*, Recorder.

*Hugh Maxwell*, District Attorney, Counsel for The People.

*M'Ewen*, *Scott*, and *F. A. Blake*, Counsel for the Prisoners.

*Meeting together, by concert, with weapons likely to produce death, and with such indications of violence as would lead to reasonable apprehensions of fatal consequences and proceeding to attack the deceased which attack results in his death, all are guilty of murder.*

This was an indictment against the prisoners for the murder of one Titus Oliver, which offence was alleged to have been perpetrated on the 28th day of June, 1822.

The facts developed on the trial, so far as they were material, were substantially as follows: About dusk, on the evening of the 28th day of June, the defendants fell in with the deceased and his wife at the place of residence of the latter. The deceased asked his wife for a shirt, which she refused to give him. He then extended his arm towards her; but whether to strike her, or merely to take hold of her, appeared uncertain. On this she struck him. Whether he returned the blow or not was not clearly proved; but, from the whole tenor of the evidence, a conclusion was

*Where the attack is not*

made, however, in pursuance of the *original design*, but on new provocation, the killing may be *manslaughter* or *murder*, according to circumstances; and it is in such case the duty of the jury to refer it to the new provocation, unless it *clearly* appear to have been on the antecedent grudge.

How far the obligation to fly exists, or how long it continues before homicide can be regarded as excusable, depends on the suddenness and violence of the attack, the imminence of the danger, and the age, strength, and sex of the parties.

N'W YORK.
Sept. 1823.

The People
v.
Garretson
and others.

fairly warranted that he did so.. On this the wife, together with two of the prisoners, to wit, Jane Garretson and Susan Brown, attacked him violently with their clubs, beating him very severely; but whether the blows did or did not fall on his head did not appear, as the witnesses could state nothing with certainty on the subject. The deceased was armed with a club about the same size with those used by the prisoners, and with it resisted their attack.

At length the prisoners fled, and the deceased, still armed with his bludgeon, pursued them at full speed. After running some considerable distance, (the deceased continually after them,) and just as he had come up with them, the prisoners turned from the street into a neighbor porch. At this moment the deceased stopped, apparently to fasten his shoe, when one of the prisoners, Jane Garretson, instantly stepped from the porch, and struck him a violent blow on the back of the head. He bled profusely— was soon afterwards taken to the workhouse, and during the night was very ill. The next morning he was taken to the alms house, where, after lingering about two days, he expired.

One witness testified that Jane Garretson, after the affray, said she had almost killed "old Tite," and that it was a pity she had not quite. It was farther proved that before the deceased took hold of, or struck his wife a second time, Susan Brown said to him, "if you strike her you shall never strike another woman;" and that after the deceased appeared to be dying, she also said, with reference to the transaction, she would kill any negro who would whip his wife.

It appeared that the deceased was an athletic man; that he manifested violent passion and anger while engaged in the pursuit; and that when he stooped to fasten his shoe he was almost, if not quite, within striking distance of the prisoners—so near, indeed, that Jane Garretson had only to advance a single step before she inflicted a blow.

It was not proved, on the part of the prosecution, that the prisoners came together at the time of the affray by pre-concert, or otherwise than by mere accident, nor that any threats had been uttered by either of them in relation to the deceased.

F. A. Blake, in opening the defence, adverted, in an argument of considerable length, to the discrepancies in the evidence on the part of the people, and to the apparent interest and warmth manifested by some of the witnesses. He contended, that these circumstances so far impaired their credibility, and introduced so much confusion and uncertainty, that it would be altogether unsafe to convict the accused. Without entering into these details, we shall merely advert to the principal points of law on which he urged an acquittal.

We concede, said the counsel, that if the prisoners at the bar had met together by concert, armed with weapons likely to produce death, in such numbers, and with such indications of a violent intention as would lead to a fair, and reasonable apprehension of *fatal consequences*, and if, in the prosecution of their unlawful design, they had proceeded to an attack on the deceased which had resulted in his death, all concerned in the riot would have been answerable, in the fullest extent, for the consequences of their *common enterprize*, and would, in judgment of law, have been guilty of murder. (1 Eas. Pl. Cr. 257, 8, 9. Ibid. 293. 4 Bl. Com. 200. 1 Hal. Pl. Cr. 53, 442. 445. 1 Haw. Pl. Cr. c. 29. s. 10. c. 31. s. 46. 2 Roll. Rep. 120. Kelynge, 117. 1 Hal. His. P. C. 39.)

We maintain, however, that the present case does not fall within this rule. No evidence of preconcert has been adduced. The assemblage of *three women*, even with an intent to beat the deceased, surely cannot be considered such a *dangerous coalition* as to jeopardize life or limb. The weapons with which they were armed, though they *might by possibility* produce death, were not such as, in the hands of females, would *probably* lead to fatal conse-

N'W YORK,
Sept 1823.

The People
v.
Garretson
and others.

quences; and in cases like the present, regard is always had to the *age, strength,* and *sex* of the respective parties. If assault and battery, or any other *mere trespass,* was all the prisoners intended, or if the jury have reasonable doubts whether more was intended or not, they can, at the most, convict of manslaughter only, even supposing the fatal blow to have been struck in the course of the original affray. The quarrel was sudden and unpremeditated; and it does not appear that any malice existed on either part. (1 Eas. Pl. Cr. 232. 252. 258. 4 Bl. Com. 193. 200. 1 Hawk. Pl. Cr. c. 30. 3 Inst. 55. 57. 2 Chitt. Crim. Law, 484.)

Again; it is a fair conclusion, from the testimony introduced on the part of the people, that the deceased was actually beating his wife, or had at least attempted to do so, before he was struck by either of the prisoners. It was the right, nay, it was the duty of every one who was present *to interfere,* with a view to the prevention of so disgraceful a violation of the peace and order of the community. Such was the right, and such the duty of the prisoners at the bar. If force was necessary, and that it was no one can deny, they were justified in making use of any degree of violence necessary to the accomplishment of their purpose, short of such as would *clearly and manifestly endanger the life or limb of the deceased;* and if death did accidentally ensue, it is not, under these circumstances, to be imputed to them as a crime. If the persons interfering had been MEN, equal or superior in point of strength to the aggressor, their most proper course would have been *to drag* him from the wife he was abusing. But when *women* interfere to protect one of their own sex from the savage and brutal attacks of a MAN, it cannot be expected that they will measure, with scrupulous precision, the degree of violence they employ, nor will the law require them so to do. They are justified by necessity in using much force; nor can that which was exerted in the present instance be considered unreasonable; and if an un-

lucky blow did terminate the existence of the assailant, his fate is to be attributed to his own unmanly attack on a defenceless female, whom he was bound by the laws of God and of man to cherish and protect. His blood rests on his own head! Even if the court and jury should conceive that less dangerous weapons might have been more proper, they are bound to exercise a tender consideration and regard towards the real intentions and motives of the accused. (1 Eas. Pl. Cr. 260, 261, 262.) We contend, therefore, that if the deceased met his death in the original affray, and owing to blows inflicted by the prisoners in the protection of his wife, the jury are bound to render in their favour a verdict of not guilty. (1 Hwk. Pl. Cr. 29. 1 Hal. Pl. Cr. 473, 4. Cowp. Rep. 832. per. Ld. Mansfield. Keilw. 108. Bro. C. 148. See Kelynge, 41.)

Let us for a moment, however, grant to the counsel for the people all he can possibly ask, to wit, that if Titus Oliver had been killed by the prisoners, or either of them in the course of the original affray, it would have been manslaughter in all. This, I say, is all which can be demanded, inasmuch as there was no premeditated and dangerous assemblage—as the affray was sudden—as the parties were equally armed—and, particularly, as the weapons used by the prisoners were not such as manifestly endangered the life of their antagonist. Under these circumstances they are guilty of manslaughter at the most; and it matters not, in point of law, whether they or the deceased gave the first provocation, or struck the first blow. (1 Hal. Pl. Cr. 456. 5 Burr. Rep. 2793, 4. 1 Eas. Pl. Cr. 255. 257. 1 Hawk. Pl. Cr. 82. 2 Burn's Jus. 591, 2. 2 Chitt. Cr. Law, 484. 1 Eas. Pl. Cr. 241. 246.

But even under these concessions as to the *law*, the *facts* which have been developed in the case at present under consideration would not warrant a conviction of the crime

N'W YORK,
Sept. 1823.

The People
v.
Garretson
and others.
of manslaughter. No witness has testified that the deceased, in the course of the *original affray,* was struck on the head. He appears, after that affray had terminated in the flight of the prisoners, to have pursued them a considerable distance, with a degree of speed utterly incompatible with the supposition that he had previously received a mortal injury. The position of the wound which occasioned his death was such as fairly to warrant the conclusion that it was inflicted by the blow struck by one of the accused while he was stooping; and it was not until subsequent to that blow that he was seen to bleed. This must have been the period when the death-blow was inflicted. Let us see, then, how the law stands, granting this to be the fact, and keeping always in view the propositions (which I presume will not be controverted by the counsel for the people,) that no premeditated malice existed at any stage of the transaction, and that its existence is essential to constitute the crime of murder.

.If the prisoners, in killing Titus Oliver in the original contest, would have been guilty of *manslaughter,* which we have for the present conceded, we do not urge even their subsequent flight—the pursuit of the deceased—the rage and excitement which he manifested during that pursuit—the imminent danger to which they were exposed when he had at length overtaken them,—nor, in fine, do we insist on the difference of sex, as a *justification* of subsequent homicide. The law is tender of life, and demands that the same tenderness should be exercised by those to whom its protection is extended. It will not, therefore, *justify* any one in depriving society of a member, and a fellow creature of existence, unless the person so doing is wholly *without fault.* (1 Eas. Pl. Cr. 277, 8. 1 Hawk. Pl. Cr. c. 28, s. 13. 22. Crom. 27. b. 1 Hal. Pl. Cr. 56.)

We contend, however, that although the prisoners are not

*justified* by the law, under the view of the case we are at present taking, in destroying the life of Titus Oliver, their offence has been merely nominal. It falls within the definition of *excusable homicide in self-defence ;* a crime, if it be one, which, however severely it was punished in former times, is, at present, regarded at law as the most venial of all transgressions. Indeed, it now owes its place in the catalogue of offences, rather to a technical adherence to antiquated definitions, than to any real imputation of criminality or guilt. (2 Burns Jus. 589. 3 Inst. 56. 1. Hawk. 76. 1 H. H. 493. 4 Bl. Com. 188. 1 Eas. Pl. Cr. 282.) Let us, in the first place, consider the law on this subject, and then see how far the acts of the accused fall within its principles.

If A. and B. meet on previous *compact*, to fight with deadly weapons, and death ensues in the course of the combat, it is murder ; nor will the case be altered if A. *fly*, and being pursued and overtaken by B., turns and slays him. However imminent may be the peril of A.—however great may be the danger to which he is exposed—the *deliberate malice and preconcert* attach to the whole transaction. Where these originally existed, a subsequent flight operates not as an extenuation of the offence. (1 Hal. Pl. Cr. 479. 481. 483. 4 Bl. Com. 184. 1 Eas. Pl. Cr. 282. 285. 2 Burns Jus. 588.)

This has been doubted by an able writer, Mr. Dalton, who has held that even where the original assault was on *malice prepense*, the crime is reduced to excusable homicide se defendendo, by the *flight* even of the *aggressor*. Hawkins and East have considered this opinion worthy of much comment and discussion; but the law is, at the present day, settled as I have stated it. (Cromp. fol. 22. b.)

But the case is far different where A. and B. *suddenly* quarrel, and a combat takes place, even with deadly wea-

N'W YORK,
Sept. 1823.

The People
v.
Garretson
and others.

pons. This does not betray, on the part of either of the combatants, the deliberate malice—the cool and determined contempt of legal restrictions, and the heart devoid of social duty, which are essential ingredients of the crime of murder, and which render it the duty of a court of justice to take away the life of the offender. In such a case, the humanity of the law allows even the *assailant* the benefit of repentance. If he does repent—if he abandon the conflict, and fly, not with a view to the *evasion of punishment*, but with a sincere and honest intention to escape from strife, his antagonist follows at his peril. If he be overtaken, and afterwards slay his pursuer in self-defence, the benignity of the law exempts him from punishment, even though he were originally in fault. (1 Eas. Pl. Cr. 281. 1 Hal. Pl. Cr. 482. 4. Bl. Com. 185. 2 Burns' Jus. 588.) This principle is consonant with expediency and sound policy; for even when crime has been commenced, it is surely better by encouraging repentance to arrest its progress, than to destroy, by indiscriminate punishment, the principal inducement to the relinquishment of a criminal design. Under such circumstances, the law, as it stands at the present day, entitles the prisoner to a full and unqualified acquittal. (Fost. Cr. Law, 288. 4 Bl. Com. 188.)

The *existence* and *continuance* of the obligation to fly depends, in all cases, on the magnitude and imminence of the danger to which the retreating party is exposed. (Selfridge's Trial, 160. Hawk. Pl. C. c. 29. § 13.) In the charge delivered by his honour C. J. Parker, (a judge whose talents and erudition need no comment,) in the trial of T. O. Selfridge, the principal is clearly and forcibly stated : "The jury are bound to consider the rapidity and violence of the attack—the nature of the weapon with which it is made—the place where the catastrophe happened—the muscular debility or vigour of the defendant, and his

power to resist or to fly. (Selfridge's trial, 164.) Can it be denied, that in the present case each of these considerations must operate most forcibly in favour of the prisoners?

In the present instance, then, we care not which party was originally in fault: the accused are wounded women; if they did commence an unfortunate quarrel they had abandoned it and fled. They had evaded the pursuit of the deceased, until flight was no *longer* consistent with a common regard to personal safety. When at length retreat was no longer practicable, they availed themselves of an opportunity which providentially occurred of securing their own lives, at the hazard of that of their pursuer; and in so doing, they were excused by the dictates of reason, and by the first principle which the God of nature has implanted in every bosom—the principle of self preservation, as well as by the laws of their country.

The counsel concluded by stating that witnesses would be introduced who would prove that the character of Jane Garretson, the individual particularly implicated, was that of an honest, industrious, and peaceable woman.

Witnesses were accordingly called, and examined by Charles McEwen, Esq., on behalf of the prisoners. They represented the character of Jane Garretson to be good— but one witness stated that about an hour previous to the affray, several women, among whom were the prisoners, came into his store near the residence of the deceased, armed with clubs, and stated that they were in pursuit of a damned negro, whom they would kill if they could find him.

*Scott*, in his argument, recapitulated the evidence, and cited several authorities in favour of the prisoners, in addition to those introduced in the opening of the defence. When he concluded, Blake observed to the court that the case had assumed, owing to the statement of the witness last examined on behalf of the prisoners, a

most solemn and important character.   That the testimony to which he alluded seemed, at first blush, to establish a killing with *malice prepense*, and that, under these circumstances, he felt it his duty to request permission again to address the jury.   He admitted that this course was not sanctioned by the ordinary practice of the court, but presumed that in a case of so much moment as the present, it would not be objected to.   No objection was made, and he proceeded.

He contended, that even granting it would have been murder in the prisoners, if the deceased had been killed in the original affray, and in the *prosecution of their original design*, it was nevertheless, the duty of the jury, under existing circumstances, to render a verdict of acquittal, on the following grounds:

Where an old quarrel has existed between individuals, and, owing to the animosity it had excited, the one kills the other, it is clearly murder; but if they meet, and *new provocation* is given, which, in the absence of all former malice, would have reduced the offence, it is the duty of the court, unless it clearly and distinctly appears that the killing was occasioned by the antecedent grudge, to refer it to the new provocation, and it is merely manslaughter (Fost. 68. 2. Chitt. C. L. 482. 1 Haw Pl Cr. c. 31. s. 30. 1 H. H. P. C. 452. Crom. 23. a. Dal. cap. 93. 1 Roll. W. 360. 3 Bulst. 171. 1 Hal. P. C. 452. 455. 3 Ins. 48. 4 Bl. Com. 193. 200. 1 Hal. Pl. Cr. 440. Ibid. 49. 1 Eas. P. C. 224. 225. Selfridge's trial 123.)   He farther urged that in this instance, whatever might have been the previous malice of the accused, it clearly appeared that the immediate cause of the killing arose on the instant, to wit, from the violence offered by the deceased to his wife.   If, therefore, his life had been destroyed in the original contest, it would have been but manslaughter; and the subsequent flight of the prisoners would still reduce their crime to the nominal offence of ex-

cusable homicide *se defendendo*, or in self defence. On this ground he insisted on a verdict of not guilty.

*Maxwell*, for the people, admitted with much ingenuousness the authority of the cases cited by the prisoner's counsel, and granted that fresh provocation had been given, *at the time of the killing*, sufficient to reduce the crime of the prisoners below the degree of *murder*. He insisted, however, that they had not fled as far as possible, and that as the deceased had desisted from pursuit at the time when he was stricken, their danger was not so imminent as to require the extreme violence which they actually used. He claimed therefore a conviction of *manslaughter*, as due to public justice and to the laws of the land.

The charge was delivered by his honor *Ogden Edwards*, and reflected much credit on his abilities, his learning, and his humanity. He recognized the principles of law insisted on by the counsel for the prisoners, and expressed a decided opinion, that the crime amounted merely to manslaughter. He observed, however, that it would be the duty of the jury to convict of the latter offence, unless they considered the original attack of the prisoners entirely justifiable. That the deceased, at the time when the fatal blow was inflicted, appeared to have relinquished his pursuit; and the killing could not therefore be considered as a case of excusable homicide in self defence.

The jury retired, and after considerable deliberation returned their verdict *not guilty of murder, but guilty of manslaughter;* at the same time recommending the prisoner, Hannah Thompson, to the mercy of the court.

Sentence, imprisonment in the state prison of the southern district of New York at hard labour, for the following terms, to wit: Jane Garretson for the term of five years, —Susan Brown for the term of four years, and Hannah Thompson for the term of three years.

N'W YORK Sept. 1823.

The People v. Garretson and others.